Slip Op. 07-3

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____ :
                               :
SHANDONG HUARONG MACHINERY     :
COMPANY,                       :
                               :
             Plaintiff,        :
                               :
        v.                     :   Before: Richard K. Eaton, Judge
                               :
UNITED STATES,                 :   Consol. Court No. 03-00676
                               :
             Defendant,        :
                               :
      and                      :
                               :
AMES TRUE TEMPER,              :
                               :
             Deft.-Int.        :
_____ :
```

<u>OPINION</u>

[Motions for Judgment Upon the Agency Record of Shandong Huarong Machinery Co. and Ames True Temper are denied; United States Department of Commerce's Final Results of Redetermination Pursuant to Court Remand are sustained.]

Dated: January 9, 2007

*Hume & Associates PC* (*Robert T. Hume*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*), for defendant.

*Wiley Rein & Fielding LLP* (*Timothy C. Brightbill*, *Eileen P. Bradner* and *M. William Schisa*), for defendant-intervenor.

Eaton, Judge: Before the court are the United States

Department of Commerce's ("Commerce") Final Results of

Redetermination Pursuant to Court Remand ("Remand Results"); the comments of plaintiff Shandong Huarong Machinery Company ("Huarong") and defendant-intervenor Ames True Temper ("Ames");[1] and Commerce's and Ames's replies.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the reasons that follow, the court denies Huarong's and Ames's motions for judgment upon the agency record and sustains the Remand Results.


                            BACKGROUND

     In accordance with this court's opinion and order in *Shandong Huarong Machinery Company v. United States*, 29 CIT __, slip op. 05-54 (May 2, 2005) (not published in the Federal Supplement) ("*Shandong I*"), Commerce reopened the record and issued four supplemental questionnaires on June 20, August 3, August 17 and September 12, 2005.  Prior to issuing the Remand Results, Commerce released the Draft Results of Redetermination Pursuant to Court Remand ("Draft Redetermination") to Huarong and Ames, to which both filed comments.  In the Remand Results,

---

     [1]     Ames filed its own motion for judgment upon the agency record challenging certain aspects of Commerce's final results in this investigation as plaintiff in the action commenced under Court No. 03-00737, which has been consolidated with this case. *See* Order of 12/23/03.

Consol. Court No. 03-00676                                    Page 3

Commerce revised Huarong's dumping margin to 31.00 percent.[2]  *See*
Remand Results at 2.


                           STANDARD OF REVIEW

     The court reviews the Remand Results under the substantial
evidence and in accordance with law standard, which is set forth
in 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful
any determination, finding, or conclusion found . . . to be
unsupported by substantial evidence on the record, or otherwise
not in accordance with law . . . .").  "Substantial evidence is
'such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp.
(30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003)
(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).
"Substantial evidence requires more than a mere scintilla, but is
satisfied by something less than the weight of the evidence."
*Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)
(internal citations and quotation marks omitted).  The existence
of substantial evidence is determined "by considering the record
as a whole, including evidence that supports as well as evidence

--------

        [2]    Commerce originally assigned Huarong a 30.02 percent
dumping margin for the period of review.  *See* Heavy Forged Hand
Tools, Finished or Unfinished, With or Without Handles, From the
People's Republic of China, 68 Fed. Reg. 53,347, 53,348 (ITA
Sept. 10, 2003) ("Final Results").  The Issues and Decision
Memorandum, dated September 2, 2003, that accompanied the Final
Results shall be cited as "Issues & Dec. Mem."

that 'fairly detracts from the substantiality of the evidence.'"
*Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United
States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The court "must
affirm [Commerce's] determination if it is reasonable and
supported by the record as a whole, even if some evidence
detracts from [Commerce's] conclusion."  *Nippon Steel Corp. v.
United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal
quotation marks omitted).

DISCUSSION

I.   Steel Scrap Offset

     In the Final Results, when calculating normal value,
Commerce denied Huarong a scrap sales offset for steel scrap
generated from the production of the subject bars and wedges
because Huarong had not allocated the quantity of scrap sold
between subject and non-subject merchandise.  *See* Issues & Dec.
Mem., cmt. 14 at 28-29.  In *Shandong I*, the court remanded to
Commerce with instructions to reopen the record to afford Huarong
a reasonable opportunity to respond to Commerce's second
supplemental questionnaire, i.e., to indicate how much scrap
attributable to the subject merchandise was actually sold during
the period of review.  On remand, Huarong submitted new data.  In
addition, Huarong proposed an allocation methodology.

     In the Remand Results, Commerce largely accepted Huarong's

methodology but revised it to use the weight of steel used as an input, rather than the weight of finished products as Huarong had proposed, to calculate the offset.  "[Commerce] divided the scrap sales allocated to bars by the total steel input weight of both wrecking bars and crow bars," and multiplied this ratio "by the input weight of steel for each CONNUM."[3]  Calculation Mem. for the Final Remand Redetermination at 2, Pub. AR 3527 (ITA Nov. 30, 2005); Remand Results at 28.  Using this methodology, Commerce applied a steel scrap offset in its calculation of normal value.

Before the court, Ames does not dispute the revised methodology itself.  Rather, it argues that the "Remand Results, like the draft results, are not supported by substantial evidence," and reasserts several grounds it raised previously before Commerce to challenge the sufficiency of the documentation that Huarong supplied to Commerce on remand.  Ames's Comments on Redetermination Pursuant to Court Remand ("Ames's Remand Comments") at 2 ("Rather than repeat them, we again note our valid concerns as provided in [Ames's comments to the Draft

---

[3]     "Control numbers, or CONNUMs are used by Commerce to designate merchandise that is deemed identical based on the Department's model matching criteria. . . .  CONNUMs are used as the basis for product identification in most cases."  *Koenig & Bauer-Albert AG v. United States*, 24 CIT 157, 161 n.6, 90 F. Supp. 2d 1284, 1288 n.6 (2000), *aff'd in part, vacated in part on other grounds*, 259 F.3d 1341 (Fed. Cir. 2001).

Consol. Court No. 03-00676                                    Page 6

Redetermination dated Oct. 17, 2005].").[4]  In particular, Ames

argues that "Huarong has failed to provide sufficient documentary

support for the data used in calculating [Huarong's proposed

scrap ratio]."  Ames's Draft Redetermination Comments at 2.

     First, Ames asserts that Huarong submitted false, unreliable

documentation in response to Commerce's supplemental

questionnaires:

> On the English translation of the invoice
> [used to support the figures that appear in a
> worksheet prepared by Huarong], Huarong put
> in "scrape {sic} steel sales" under the
> category "goods & labor taxable" to indicate
> that the underlying transaction was a sale of
> scrap.  On the original Chinese receipt,
> however, there is no indication whatsoever
> that it is a "scrap steel sale" under that
> category.

Ames's Draft Redetermination Comments at 2.  In response,

Commerce acknowledges the discrepancy between the Chinese invoice

and the English translation but points out that two other

documents that Huarong submitted along with the invoice – a

payment entry sheet showing the payment Huarong received for the

sale and an accounting voucher - corroborated the information in

the invoice.  *See* Remand Results, cmt. 1 at 21-22.  Therefore,

Commerce concluded that the documentation submitted by Huarong

was reliable.  *See id.* at 24.

     Second, Ames argues that Huarong's supporting documentation

---

[4]     These comments shall be cited as "Ames's Draft
Redetermination Comments."

is not "tie[d] . . . to its financial statements or accounting records" that can be verified, and thus, "under [19 U.S.C. § 1677m(e)(2)][5] Commerce must reject this information and deny Huarong any offset."  Ames's Draft Redetermination Comments at 3. In response, Commerce notes that although Huarong admitted its accounting records were incomplete for the period of review, there is other evidence tending to verify its records.  *See* Remand Results, cmt. 1 at 22.  Indeed, according to Commerce, Huarong provided documentary evidence, such as vouchers, undisputed invoices and payment entry sheets, and explained how its accounting system works.  *Id.* (noting Huarong was able to "demonstrate how its records reconcile when it enters scrap sales into its books and records.").

Third, Ames argues that Huarong should be denied an offset because Huarong used "caps" to report factors of production, and

---

[5]     Subsection (e), titled "Use of certain information" provides, in pertinent part:

> In reaching a determination under [*inter alia*, 19 U.S.C. § 1675] the administering authority . . . shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if— . . .
>
> (2) the information can be verified . . . .

19 U.S.C. § 1677m(e)(2).

not actual usage.[6]  Ames asserts that because a cap is based on

budgeted rather than actual usage rates, it fails to account for

variances between actual production and budgeted amounts, and

thus constitutes a failed response.  *See* Ames's Draft

Redetermination Comments at 4.  Ames also argues that denying the

offset is appropriate here because it is not clear what portion

of Huarong's reported steel consumption became scrap.  *Id*. at 5.

    In response, Commerce first notes that it "has accepted

'caps' in the past when the 'caps' were found to reasonably

reflect actual consumption," and here, it "accepted Huarong's use

of 'caps' in reporting its steel consumption rates in the

preliminary and final results in this review" without any

---

        [6]     When reporting the amount of an input, such as steel,
that is consumed to produce subject merchandise, a company may
give an estimate, rather than an actual amount.  This estimate is
called a "cap."  In this investigation, "Huarong reported 'caps'
for steel billets, the steel scrap offset, unskilled labor,
skilled labor, and unskilled packing labor."  Heavy Forged Hand
Tools, Finished or Unfinished, With or Without Handles, From the
People's Republic of China, 68 Fed. Reg. 10,690, 10,693 (ITA Mar.
6, 2003) (prelim. results) ("A production 'cap' is an estimate of
the amount of factor input the company used to make the product
in question."); *see also Shandong Huarong Gen. Group Corp. v.
United States*, 27 CIT 1568, 1574 (2003) (not published in the
Federal Supplement) ("[T]he consumption amounts reported for the
factors of production were based on what company officials call
'caps,' which are the company's closest approximation of the
inputs used based on years of production experience manufacturing
the subject merchandise." (internal quotation marks and citation
omitted)); *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United
States*, 25 CIT 1150, 1169 n.34, 178 F. Supp. 2d 1305, 1326 n.34
(2001) ("Caps are approximations, based on historical production
norms, of costs and quantities of inputs for factors of
production.").

previous objection from Ames.  Remand Results, cmt. 1 at 24-25.

Next, Commerce points to questionnaire responses where "Huarong

stated on the record that its reported steel [factor of

production] is a pre-production quantity."  *Id*. at 25 (citing

Huarong's June 24, 2002, Sec. D Resp. at D-6).  Since pre-

production quantity, by definition, "includes the steel that will

become scrap during the production process," *id*., the caps

reasonably reflected the amount of steel that became scrap.

Thus, according to Commerce, the record evidence supported the

use of caps.

     The court finds that Commerce complied with the court's

remand instruction to reopen the record in order to afford

Huarong "a reasonable opportunity to respond to [Commerce's]

second supplemental questionnaire."  *Shandong I*, 29 CIT at __,

slip op. 05-54 at 8.  In accordance with the court's instruction,

Commerce reopened the record and issued four supplemental

questionnaires.  In addition, the court finds that Huarong's

proposed allocation methodology as revised by Commerce is in

accordance with law.  "Commerce need not prove that its

methodology was the only way or even the best way to calculate

surrogate values for factors of production, as long as it was a

reasonable way."  *Coalition for the Pres. of Am. Brake Drum and

Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 118, 44 F.

Supp. 2d 229, 258 (1999) (citation omitted).  Here, there is no

dispute as to the reasonableness of Commerce's methodology. Huarong does not dispute the revised methodology.  Nor does Ames. Indeed, the revised methodology reflects the change Ames proposed in its Draft Redetermination Comments.  The revised methodology is therefore sustained.

As to Ames's objections with respect to substantial evidence, Commerce explained that the documentation submitted by Huarong to support its reported scrap sales was corroborated by other record evidence, and was therefore reliable and not "false."  In addition, it found that Huarong explained how its accounting system worked and demonstrated how scrap sales were reconciled in its accounting records.  Finally, the use of caps was found by Commerce to be reasonable because the reported quantity of steel consumed in producing the subject merchandise is the pre-production quantity, which includes steel that will become scrap during production.  As set forth above, Commerce has cited substantial evidence to support its conclusions.  In addition, Commerce has used reasonable judgment in considering the evidence and considered evidence that supports as well as "fairly detracts from the substantiality of the evidence." *Huaiyin*, 322 F.3d at 1374 (internal quotation marks omitted). The court thus finds Commerce's conclusions to be supported by substantial evidence and sustains Commerce's scrap offset calculation.

II.   *Sigma* Cap

As explained in *Shandong I*, the court in *Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) found that

> when calculating constructed value where the
> cost of an imported input is presumed to be
> the same as its domestic counterpart, a
> rational manufacturer will minimize its
> material and freight costs by "purchasing
> imported [product] if the cost of
> transportation from the port to the foundry
> [is] less than the cost of transportation
> from the domestic . . . mill to the foundry."
> Put another way, where the cost of the
> imported and domestic product are presumed to
> be the same, the manufacturer is further
> presumed to acquire the product from the
> nearest source in order to minimize freight
> costs.

*Shandong I*, 29 CIT at __, slip op. 05-54 at 8-9 (citing *Sigma*, 117 F.3d at 1408) (alterations in original).

In the Final Results, Commerce sought to comply with *Sigma* by using "the distances that Huarong's steel suppliers were from Huarong to calculate a weighted average distance.  Since the resulting weighted average was greater than the distance from Huarong to the nearest port, Commerce applied a cap equal to that distance for the inland freight cost."  *Id*. at 9 (footnore omitted).

In *Shandong I*, the court instructed Commerce to "explain why, in calculating its weighted average [supplier distance], [Commerce] should include any distance greater than the distance from [Huarong's factory to] the nearest port or, failing that,

adjust its methodology appropriately." *Shandong I*, 29 CIT at __,
slip op. 05-54 at 10 (discussing *Lasko Metal Prods., Inc. v.
United States*, 43 F.3d 1442 (Fed. Cir. 1994) and *Sigma*, 117 F.3d
1401).  In other words, the court reasoned that if no rational
producer "would choose to pay the highest combination of prices
for [an input] plus freight," *Sigma*, 117 F.3d at 1408, including
distances greater than the distance between Huarong's factory and
the nearest port would not produce an accurate dumping margin.

On remand, Commerce examined the *Lasko* and *Sigma* cases and
found that "capping the distance for each supplier (the '<u>Sigma</u>
cap') *before* calculating the weighted-average freight distance
yields a more accurate result, based on <u>Sigma</u>, and [it] . . .
changed [its] calculation of the surrogate freight cost
accordingly."  Remand Results at 5 (emphasis added).  Commerce
then calculated inland freight cost by weight-averaging the
distances from Huarong's multiple steel suppliers to Huarong's
factory with no single distance greater than the distance to the
nearest port.  Commerce explained its reasoning this way:

> [A] rational company located in a market
> economy would purchase identically priced
> inputs only from those suppliers that are
> closer to its factory than the nearest port.
> In the case of the [non-market economy, or
> "NME"] methodology, all suppliers are assumed
> to charge the same price for their input.
> When a NME company reports two or more input
> suppliers, where one supplier is more distant
> than the nearest port and the other is closer
> than the nearest port, the application of a
> single price means that a market-economy firm

> would not purchase inputs from the more
> distant supplier, because purchasing from the
> farther supplier would not be rational under
> these conditions, due to the higher freight
> cost.  As a consequence, applying the _Sigma_
> cap before calculating the weighted-average
> freight distance will result in a more
> accurate surrogate freight cost, in
> accordance with the [Federal Circuit]'s
> reasoning in both _Sigma_ and _Lasko_.

_Id_. at 7.  The court finds that Commerce's methodology and

explanation accord with the principles set forth in _Sigma_ and

_Lasko_.

Ames does not disagree with the basic premise that rational

producers seek to minimize freight costs.  Rather, Ames argues

that Commerce's assumption that suppliers charge the same price

for their input "does not correspond to the reality of this

case."  Ames's Draft Redetermination Comments at 10.  According

to Ames, "[i]n this review . . . there is _no_ evidence on the

record to suggest that the price before freight was the same from

every supplier."  _Id_. at 9 (emphasis in original).  Because

Huarong purchased input from multiple suppliers, which are at

different distances from the factory, Ames argues this is

evidence that "prices charged were different, or that

transportation cost was not the only variable in decision-

making."  _Id_.

While Ames's interpretation of the evidence may be

plausible, it is not the only reasonable interpretation.  As

Commerce points out, "Ames appears to concede . . . [that] there

are numerous reasons why a particular supplier or group of suppliers may be used; thus, the use of multiple suppliers does not, by itself, demonstrate the prices differed." Commerce's Resp. Pls.' Remand Comments at 10. That a piece of evidence is susceptible to more than one reasonable interpretation does not detract from the substantiality of the evidence supporting Commerce's decision. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, there is no apparent reason to abandon the teaching in *Sigma* in this case.

Commerce examined the methodology employed in the Final Results in light of *Sigma* and *Lasko*, found it appropriate to revise its calculations and explained its revised calculations in the Remand Results. Thus, the court finds Commerce has complied with the remand instructions in *Shandong I*, and Commerce's revised methodology is in accordance with law. There being no challenge to the inland freight calculation itself, that calculation is sustained.

III. Commerce's Decision Not To Exclude U.S. Export Data In
     Calculating Normal Value

In *Fuyao Glass Industry Group Company v. United States*, 27 CIT 1892 (2003) (not published in the Federal Supplement) ("*Fuyao I*") and *Fuyao Glass Industry Group Company v. United States*, 29 CIT __, slip op. 05-6 (Jan. 25, 2005) (not published in the Federal Supplement) ("*Fuyao II*"), Commerce rejected surrogate

data from the market economies of Korea, Indonesia and Thailand

because of subsidy programs available in those countries.  In

doing so, it relied on the legislative history surrounding the

enactment of 19 U.S.C. § 1677b(c)(4) as its authority, which

states in pertinent part: "In valuing . . . factors [of

production], Commerce shall avoid using any prices which it has

reason to believe or suspect may be dumped or subsidized prices."

Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep.

100-576, at 590-91 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547,

1623.  In its final determination resulting in *Fuyao I*, Commerce

stated, "What is relevant to [Commerce's] determination of

whether it has a reason to believe or suspect that prices may be

subsidized, is the existence of a subsidy program.  A subsidy is,

in itself, a market distortion."  *Shandong I*, 29 CIT at __, slip

op. 05-54 at 19 (quoting Final Results of Redetermination

Pursuant to Remand, *Fuyao Glass Indus. Group Co. v. United

States*, 27 CIT 1892, at 37-38).

Here, Commerce did not exclude U.S. export data from the

Indian import statistics it used to value factors of production,

citing its authority under 19 U.S.C. § 1677f-1 and 19 C.F.R.

§ 351.413 (2003) to disregard "insignificant adjustments" to

normal value.[7]  *See* Issues & Dec. Mem., cmt. 2 at 9.  In *Shandong*

---

[7]    Section 1677f-1 provides that when determining normal
value under 19 U.S.C. § 1677b Commerce "may . . . decline to take
                                                  (continued...)

*I*, the court directed Commerce to explain its decision to include data on allegedly subsidized U.S. exports in light of *Fuyao I* and *Fuyao II*.

The court finds that Commerce complied with the court's instruction to more fully explain its decision to disregard the effect of subsidies from the United States and other countries, in light of *Fuyao I* and *Fuyao II*.  In both the *Fuyao* cases and the case at bar, the question concerns the construction of normal value in the NME context.  In each case, Commerce valued a factor or factors of production purchased from a market economy supplier.  Normally, the price paid for these factors of production would be considered to be reliable and used to calculate normal value.  *See China Nat. Mach. Imp. & Exp. Corp. v. United States*, 27 CIT 255, 264, 264 F. Supp. 2d 1229, 1237

---

[7](...continued)
into account adjustments which are insignificant in relation to the price or value of the merchandise."  19 U.S.C. § 1677f-1(a)(2).

Commerce's regulations define "insignificant adjustment":

> Ordinarily, under [19 U.S.C. § 1677f-1(a)(2)], an "insignificant adjustment" is any individual adjustment having an *ad valorem* effect of less than 0.33 percent, or any group of adjustments having an *ad valorem* effect of less than 1.0 percent, of the export price, constructed export price, or normal value, as the case may be.

19 C.F.R. § 351.413.

(2003) ("Where actual prices reflect true market values, not to
employ such prices would indeed be contrary to Commerce's mandate
of estimating antidumping duty margins as accurately as
possible." (internal quotation marks and citation omitted)).  In
the *Fuyao* cases, however, Commerce elected to avoid using the
actual prices paid because it maintained that it had reason to
believe or suspect that the prices were subsidized.  *See Fuyao I*,
27 CIT at 1904 ("[P]rior CVD findings may provide the basis for
the Department to also consider that it has particular and
objective evidence to support a reason to believe or suspect that
prices of the inputs from that country are subsidized.") (quoting
Issues & Dec. Mem. at 11).  In those cases, Commerce did not
inquire into the degree of subsidization, reasoning that, under
its methodology, any level of subsidy was sufficient to require
it to disregard the price paid for an input.

Here, Commerce has refined its methodology by adding a
preliminary step.  Where a claim of subsidization is made,
Commerce will now first determine whether the inclusion or
exclusion of the allegedly subsidized price for the factor of
production affects the calculation of normal value in a
significant way:

> In the <u>Final Results</u>, we conducted our
> analysis by first calculating two surrogate
> values, one with U.S. exports included and
> one other with the [allegedly subsidized]
> U.S. data excluded.  We calculated [normal
> value] using both sets of surrogate values

> and calculated the total weighted-average
> [normal value] with U.S. exports included,
> and with U.S. exports excluded.  We found
> that [normal value] changed only by 0.21
> percent.  As this adjustment would be an
> insignificant adjustment to [normal value]
> [under 19 C.F.R. § 351.413], we did not
> remove imports from the United States from
> Indian import data when calculating the
> surrogate values used in the administrative
> review.

Remand Results at 11 (citations omitted).  It can be assumed that

had Commerce found a more substantial effect on normal value from

the inclusion of the challenged prices it would have then

conducted a further analysis in accordance with the "reason to

believe or suspect" test found in the *Fuyao* cases.[8]

The court finds that Commerce's method of examining

allegedly subsidized inputs by incorporating a preliminary step

to determine whether inclusion or exclusion of inputs affects

normal value in a significant way, is reasonable.  As a result,

_____

[8]     As set forth in *Fuyao II*:

> [T]o justify a finding with respect to
> subsidization, Commerce must demonstrate by
> specific and objective evidence that (1)
> subsidies of the industry in question existed
> in the supplier countries during the period
> of investigation . . . ; (2) the supplier in
> question is a member of the subsidized
> industry or otherwise could have taken
> advantage of any available subsidies; and (3)
> it would have been unnatural for a supplier
> to not have taken advantage of such
> subsidies.

*Fuyao II*, 29 CIT at __, slip op. 05-6 at 10.

Commerce's decision not to exclude U.S. export data in

calculating normal value is sustained.


IV.  Brokerage and Handling: Labor Costs

        In the Final Results, Commerce found, based on its

"judgment" and "experience," that the surrogate value for

brokerage and handling likely included the labor costs incurred

by Huarong in making steel pallets.  *See Shandong I*, 29 CIT at

__, slip op. 05-54 at 22-23 (quoting Issues & Dec. Mem. at 21-

22).  In *Shandong I*, the court found that Commerce had not

supported this finding with substantial evidence and remanded to

Commerce to "supply more information and a more complete

explanation to support its decision to include [labor costs for

making steel pallets] under brokerage and handling."  *Id*. at 23.

        On remand, Commerce collected more information from Huarong

and explained:

                For this redetermination, we requested that
                Huarong provide the usage rate for labor
                required to manufacture self-produced steel
                pallets and the consumption rate for the
                materials and energy used when welding the
                steel into pallets.  In response, Huarong
                reported consumption rates for labor and
                welding rod used in producing the pallets,
                and noted that the electricity used for
                welding the steel pallets was included in the
                previously reported electricity consumption
                rate.  We valued welding rod using publicly
                available Indian import statistics for
                February 2001 through January 2002 . . . .
                We valued labor for making pallets using the
                regression-based wage rate for the PRC that

>           the Department applied for both skilled and
>           unskilled labor in the Final Results.

Remand Results at 13 (citations and footnote omitted).  Thus,

Commerce took labor costs into account in its calculation of

normal value.

     None of the parties filed specific objections with the court

regarding Commerce's findings on this issue.  As is apparent from

the Remand Results, Commerce requested and received information

from Huarong concerning the labor and electricity used to make

steel pallets and valued the factors of production using Indian

surrogates, as it did with other factors of production in this

case.  That being the case, and Commerce having complied with the

court's remand instructions, the findings are sustained.


V.   Brokerage and Handling: Movement Costs

     In the Final Results, Commerce relied on its experience,

without citing specific evidence, to find that movement expenses

incurred at the port of export were captured in the surrogate

brokerage and handling values used.  *See Shandong I*, 29 CIT at

__, slip op. 05-54 at 26.  In *Shandong I*, the court remanded this

issue for Commerce to provide additional information and

explanation with respect to its inclusion of movement expenses in

brokerage and handling costs, "should Commerce continue to find

on remand that the movement expenses at issue are accounted for

under brokerage and handling."  *Id.* at __, slip op. 05-54 at 27.

On remand, Commerce continued to find that movement expenses were accounted for under brokerage and handling.  It explained that it is common for companies not to itemize brokerage and handling expenses, and that neither Huarong nor Viraj,[9] the Indian company whose information Commerce used as surrogate data, itemized such expenses here.  Nonetheless, it was able to "identify certain movement-related expenses that both [Huarong and Viraj] must have incurred, and that therefore must be captured in the [brokerage and handling] surrogate value." Remand Results at 16.

Ames challenges Commerce's methodology, arguing that Commerce failed to find affirmative evidence that Viraj actually incurred the movement expenses discussed above.  Absent this evidence, Ames contends Commerce must "deduct [movement] expenses from Huarong's U.S. pricing."  Ames's Draft Redetermination Comments at 12.

It is, of course, true that Commerce's determinations must be made on the basis of facts in the record.  It is also true that, as Commerce contends, "it is entirely appropriate for the Department to make 'reasonable inferences' from the record evidence," which it has done here.  Remand Results at 32 (quoting

---

[9]     Viraj was a respondent in Certain Stainless Steel Wire Rod From India, 63 Fed. Reg. 48,184 (ITA Sept. 9, 1998) (prelim. results).  Commerce used information from the record in that investigation to value factors of production in its investigation of heavy forged hand tools from China.

*Shandong I*, 29 CIT at __, slip op. 05-54 at 23).  For example, based on "cost-insurance-freight" delivery terms included in Viraj's questionnaire responses, Commerce was able to discern that "Viraj was responsible for paying all costs incurred at the port of export."  *Id*. at 16.  Since both Huarong's and Viraj's goods were transported to the port of export by truck and loaded and secured to a vessel, Commerce found that "it [was] reasonable to infer that Huarong would have incurred . . . expenses," such as drayage.[10]  *Id.*  In addition, Commerce explained, by reference to Huarong's supplemental questionnaire responses and other record documents, its determination that other movement expenses, such as containerization, were also included in brokerage and handling.  *See* Remand Results at 17 (citing Huarong's Feb. 4, 2004, Supp. Resp. at Ex. 5; Indian Docs. Mem.).

Based on this new information and additional explanation, the court sustains Commerce's finding that movement expenses incurred at the port of export were captured in surrogate brokerage and handling values.

_____

[10]   Drayage, or cartage, is a port charge that includes "movement of merchandise from truck to container yard and from container yard to ship . . . ."  Remand Results at 17.

Consol. Court No. 03-00676                                  Page 23

### CONCLUSION

For the foregoing reasons, the court denies Huarong's and Ames's motions for judgment upon the agency record and sustains the Remand Results.  Judgment shall be entered accordingly.


                                         /s/ Richard K. Eaton
                                             Richard K. Eaton


Dated:      January 9, 2007
            New York, New York

Slip Op. 07-3

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____  :
                                :
SHANDONG HUARONG MACHINERY      :
COMPANY,                        :
                                :
              Plaintiff,        :
                                :
         v.                     :  Before: Richard K. Eaton, Judge
                                :
UNITED STATES,                  :  Consol. Court No. 03-00676
                                :
              Defendant,        :
                                :
         and                    :
                                :
AMES TRUE TEMPER,               :
                                :
              Deft.-Int.        :
_____  :
```

## JUDGMENT ORDER

Upon considering the United States Department of Commerce's ("Commerce") determination in Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China, 68 Fed. Reg. 53,347 (ITA Sept. 10, 2003) (final results) as modified by the Final Results of Redetermination Pursuant to Court Remand (Nov. 30, 2005), the memoranda and accompanying materials in support thereof, and upon all the other papers and proceedings had herein, it is hereby

ORDERED that Commerce's determination, as modified on remand, is sustained.


                                    /s/ Richard K. Eaton
                                    Richard K. Eaton

Dated:    January 9, 2007
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____      By: _____
                                              Deputy Clerk